Irwin SHAPIRO, on behalf of himself and all others similarly situated

v.

UJB FINANCIAL CORP.; T. Joseph Semrod; and John R. Haggerty, Irwin Shapiro, Robert Bassman, Jerome Katz, Norman Salsitz, Jean Lee, Executrix of the Estate of Calvin Lee, and Chappaqua Family Trust, Appellants.

No. 91–5153.

United States Court of Appeals, Third Circuit.

Argued Sept. 17, 1991.

Decided May 20, 1992.

As Amended May 28, 1992.

Rehearing and Rehearing En Banc Denied July 7, 1992.

274

Leonard Barrack (argued), Gerald J. Rodos, Barrack, Rodos & Bacine, Philadelphia, Pa., Kenneth A. Jacobsen (argued), Greenfield & Chimicles, Haverford, Pa., Robert M. Roseman, Rudolph, Seidner, Goldstein, Salmon, P.C., Eugene A. Spector, Eugene A. Spector & Associates, Philadelphia, Pa., Susan S. Thomas, Zlotnick & Thomas, Bala Cynwyd, Pa., Robert A. Skirnick, Wechler, Skirnick, Harwood, Halebian & Feffer, New York City, for appellants.

Frederic K. Becker, Wilentz, Goldman & Spitzer, Woodbridge, N.J., Irwin H. Warren, Dennis J. Block (argued), Weil, Gotshal & Manges, New York City, for appellees.

Before: BECKER and SCIRICA, Circuit Judges and VanARTSDALEN *, District Judge.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case is one of a number of federal securities actions against financially troubled banking institutions. After a sharp downturn in the financial condition of defendant UJB Financial Corporation, its shareholders filed a complaint alleging violations of §§ 11, 12(2), and 15 of the Securities Act of 1933 and §§ 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934, and various pendant state law claims. These claims are predicated on allegedly

---

* The Honorable Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

false and misleading statements made by UJB and other defendants regarding the company's loan loss reserves, earnings and income, lending practices, and internal management and credit controls.

The district court dismissed most of plaintiffs' federal claims for failure to state a claim upon which relief could be granted and for failure to plead with particularity. Fed.R.Civ.P. 12(b)(6), 9(b). The court also found that plaintiffs failed to state a common law claim for negligent misrepresentation. We will affirm in part and reverse in part.

## I. BACKGROUND

Defendant UJB Financial Corporation, a New Jersey-based bank holding company that offers a wide range of financial services, consists of 12 member banks and 11 non-bank subsidiaries.[1] Its common and Series B preferred stock are traded on the New York Stock Exchange. When plaintiffs' complaint was filed, UJB had more than $11 billion in assets, $7 billion in outstanding loans, and $8 billion in total consolidated deposits. The remaining defendants are individuals who were UJB officers[2] and directors[3] during the relevant time period, February 1, 1988 to July 18, 1990.

From 1987 to 1989, UJB saw substantial growth in assets, earnings, net income, and net worth. Total loans increased from $6.5 billion to $8.3 billion, total assets from $10.1 billion to $12.1 billion, and net income from $102 million to $118 million. The company's periodic announcements, made in quarterly and annual reports, press releases, and governmental filings, often contained more than just routine recitations of financial figures. The announcements repeatedly referred to UJB's "prudent," "cautious," and "conservative" lending pol-

icy, its "strict" credit administration practices, its "minimal" foreign loan exposure, and its "basic" approach to loan management. There were also frequent references to UJB's adherence to "sound" and "time-tested" banking practices, the "high" quality of its loan portfolio, and its "high safety margin." UJB also represented that its loan loss reserves were "strong" or "very strong," and had been and would continue to be "maintained at a level determined adequate." The bank further attributed its overall success to its "strategy" of limiting its business dealings to the New Jersey region and avoiding concentration on a few large projects.

The first sign of a downturn appeared in March, 1990, when UJB filed a 10–K Report with the Securities and Exchange Commission. The accompanying 1989 Annual Report stated that the provision for loan losses had been increased as a "prudent" measure, and asserted that the loan loss reserves, which had recently been augmented by 13.1%, were "at a level determined adequate." The same Annual Report contained an interview with UJB's President and Chief Executive Officer, Joseph Semrod, who attributed the increase in bad loans to the cyclical nature of the banking business, a slow economy, and problems in residential real estate construction and development. He noted, however, that this part of UJB's loan portfolio was "well secured," and that UJB continued to have "good loan to value ratios." He projected "continued solid growth," but conceded that UJB was "budgeting a smaller real estate portfolio."

UJB's troubles escalated in March and April of 1990 when three financial evaluation services—Moody's Investors Service, Fitch Investors Service, and Standard & Poors—downgraded their ratings of UJB debt, stock, and commercial paper, as well

---

1. This factual narrative is drawn from the complaint.

2. T. Joseph Semrod (President and Chief Executive Officer of UJB and Chairman of its Board of Directors); Clifford H. Coyman (President, Chief Executive Officer, and Director); and John R. Haggerty (Chief Executive Officer and Senior Vice-President).

3. Robert L. Boyle, Elinor J. Ferdon, Walter L. Dealtry, Fred G. Harvey, Francis J. Mertz, Henry S. Patterson, II, James A. Skidmore, Jr., and Joseph M. Tabak. All served on UJB's Audit Committee during 1989.

as their ratings of deposits belonging to UJB's principal bank subsidiary, United Jersey Bank. These analysts expected UJB's credit quality to deteriorate, particularly with regard to real estate, construction, and land development loans.

On April 18, 1990, UJB issued a press release announcing a dramatic decline in net income and an equally striking increase in its loan loss reserves and non-performing assets. Semrod nevertheless reassured the public that the "long term is what counts," and that UJB was both "positioned for the '90s and beyond" and "focused on maximum sustainable long-range earning growth and maximum long-term return." On July 18, 1990, UJB issued another press release announcing that the company's loan loss provision was four times what it had been the year before, and that earnings and income had dropped again. The price of UJB's common stock, which had been as high as $27 per share in the prior three years, plummeted to approximately $10 per share.

In reaction to these developments, plaintiff shareholders filed this class action. They attribute their economic losses to "a campaign [by defendants] to depict the illusion of UJB as a growing, profitable and vital lending institution with conservative lending practices, and a system of internal controls proper to ensure adequate collateralization and prompt recognition and accounting for problem loans." According to plaintiffs, defendants' public announcements in the years 1988–1990 portrayed UJB "in a falsely optimistic manner" by stating that the loan loss reserves were adequate, loan review procedures and policies were stringently and continuously applied, lending opportunities were balanced appropriately against risks, and financial results were positive.

The claims of the plaintiff class[4] are grouped into three separate Counts. Count I alleges that defendants misrepresented and failed to disclose material information in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1991). Count I also alleges that the individual defendants are liable as "controlling persons" under § 20(a) of the Exchange Act, 15 U.S.C. § 78t (1988), for UJB's alleged § 10(b) violations. Count II avers that representations made in certain UJB registration statements and prospectuses violated §§ 11 and 12(2) of the Securities Act of 1933. 15 U.S.C. §§ 77k(a), 77l (2) (1988). In addition, it alleges that the individual defendants are liable to certain members of the plaintiff class as "controlling persons" under § 15 of the Securities Act. 15 U.S.C. § 77o (1988). Finally, Count III charges that defendants negligently misrepresented and omitted material information in violation of their common law duty of care.[5] The complaint sets forth many detailed factual allegations in support of these claims, but paragraph 52 summarizes them all.[6]

4. The plaintiff class consists of all persons who purchased UJB's publicly traded securities between February 1, 1988 and July 18, 1990.

5. The district court did not dismiss Count IV, in which individual plaintiff Chappaqua Family Trust asserted a claim under § 14(a) of the Securities and Exchange Act, 15 U.S.C. § 78n (1988). The Trust voluntarily withdrew this claim with prejudice during the pendency of this appeal. At oral argument, however, defendants suggested that the withdrawal of Count IV was improper because plaintiffs failed to give notice and opportunity to be heard to members of the plaintiff class. This argument is unavailing because Count IV was asserted by the Chappaqua Family Trust, not the class representatives. See Complaint ¶ 79. Therefore, we need not and do not address whether a class representative may withdraw a § 14(a) claim without giving the class notice and opportunity to be heard.

The district court dismissed Count V, which alleged a breach of fiduciary duties under New Jersey corporate law. This dismissal has not been appealed.

6. Paragraph 52 provides:

"During the Class Period, the defendants, individually and in concert, directly and indirectly, engaged and participated in or aided and abetted a continuous course of conduct and conspiracy to conceal adverse material information regarding the finances, financial condition and future prospects of UJB as specified herein. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct as hereinafter alleged in an effort to maintain artificially high market

Defendants filed a motion to dismiss, which the district court granted in part and denied in part. The district court dismissed with prejudice all claims in Counts I and II "to the extent that they rely on ¶¶ 52(a), (b), (c), (f), and (g) of the amended complaint, and to the extent that they rely upon allegations of mismanagement in

prices for the securities of UJB. This included the formulation, making of and/or participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaging in acts, practices, and courses of business which operated as a fraud and deceit upon plaintiffs, and the Class. These included, among other things, the following:

(a) that the earnings, assets, and net worth of UJB were improperly and materially overstated and inflated throughout the Class Period due to grossly inadequate provisions for loan loss reserves;

(b) that the defendants caused UJB to continually understate its non-performing loans and failed to provide adequate loan loss reserves for problem loans promptly and properly, and instead granted extensions, further credits, and other beneficial terms to its problem loan customers, in order to postpone improperly the recognition of said problems in the publicly disseminated financial statements of UJB;

(c) that UJB's total loan loss reserves, particularly reserves for construction loans, were not maintained at an adequate level in light of the economic conditions prevailing in certain areas of loan concentration and the concomitant high risk of non-collectibility of a large portion of UJB's commercial real estate and other loans;

(d) that, many of UJB's larger problem loans, including but not limited to construction loans, and other loans in the Company's commercial loan portfolios, were not adequately collateralized or secure, contrary to defendants [sic] representations that:

—'our portfolio is well secured' and 'we continue to have good loan to value ratio' ...;

—the Company's 'construction and real estate related loans ... are ... well collateralized ...;'

—that UJB had 'high asset quality'....

(e) that UJB's credit review and authorization standards and policies and system of internal controls to assure adequate collateralization and prompt recognition and accounting for problem loans were not conservative, were not functioning adequately or were being disregarded, not followed or circumvented by senior officers of the Company in order to maintain artificially high reported loan and earnings growth, contrary to defendants' representations that:

—that UJB adheres to 'conservative policies ... in quickly recognizing non-performing assets' ...;

—that UJB had, '[i]n our effort to minimize our risk ... followed conservative underwriting standards' with respect to construction and development loans ...;

—that UJB's 'corporate policy toward residential, industrial and commercial construction loans' were 'conservative, cautious and therefore, profitable' ...;

—that UJB's loan quality was strong because the Company was 'paying attention to the basics of loan administration' ...;

—that 'quality' was a 'guiding principle in [UJB's] loan portfolio' ...;

—that UJB had a 'lending philosophy which emphasizes the prompt identification and follow-up of problem loans' and a 'conservative approach to problem loan recognition' ...;

—that UJB 'emphasize[d] the basics of proper loan origination procedures and good credit administration' and 'carefully monitor[s] our portfolio and ... maintain[s] a strong allowance for loan losses ...' ...;

—that UJB had been 'prudent' in construction lending ...; and

—that UJB had a 'prudent lending philosophy'....

(f) that, UJB's lending practices and controls were not sufficiently centralized, were unmanageable, and UJB's commercial lending officers had engaged in high risk and speculative loan transactions, which were not being adequately supervised, controlled, or directed by higher management, contrary to defendants' representations as set forth herein;

(g) that UJB would be required to add substantial additional amounts to its loan loss reserves as a result of its lending practices, contrary to defendants representations that:

—that UJB had a 'low level of non-performing loans,' a 'very strong allowance' for loan losses and 'solid loan loss reserve' ...;

—that UJB's loan loss reserves were 'maintained at a level determined adequate to provide for potential losses on loans'....

(h) that by announcing increases in non-performance loans or increases in reserves at various times during the Class Period (including but not limited to announcements or statements dated October 18, 1989, January 16, 1990, March 15, and April 15, 1990), defendants failed to disclose the full truth regarding UJB's problem loans and lack of controls and, indeed, gave the materially false and misleading impression that UJB had taken all steps that were necessary or appropriate in connection with UJB's problem loans; and

(i) that given the existence of these undisclosed facts concerning UJB, its business, financial condition and performance, finances and future prospects, any investment in UJB involved an extraordinarily high degree of risk."

Complaint ¶ 52.

¶¶ 52(d) and (e)." It also dismissed with prejudice the § 15 claim in Count II and the negligent misrepresentation claim in Count III. The § 11 and § 12(2) claims of Count II were dismissed for failure to state a claim upon which relief could be granted, but the district court gave plaintiffs 30 days to amend their complaint to remedy defects identified in its opinion. Finally, the district court specifically upheld the § 20(a) "controlling person" claim in Count I.

The district court found that the remaining allegations in Counts I and II based on subparagraphs 52(d), (e), (h) and (i) did not satisfy Federal Rule of Civil Procedure 9(b), which requires that fraud be pleaded with particularity. However, the court did not formally dismiss these allegations. Instead, it granted plaintiffs 30 days to amend the complaint. The court also ordered class representative Jerome Katz to post $50,000 as security in connection with the § 11 and § 12(2) claims. Following this order, plaintiffs formally announced that they would neither amend their complaint nor provide security, and instead filed a timely appeal from the district court's order. Defendants moved to dismiss the appeal.

## II. JURISDICTION

Defendants assert that there is no final appealable order because several claims were not formally dismissed by the district court.[7] According to defendants, the following two groups of claims rendered the district court's order non-final: (1) all claims asserted in Counts I and II, to the extent they rely upon allegations of fraud in subparagraphs 52(d), (e), (h), and (i) of the complaint, and (2) the § 20(a) claim asserted in Count I. We will address these contentions in turn.

### A. *§ 10(b), § 11, and § 12(2) Claims*

■ The major obstacle to appellate jurisdiction involves the allegations that did not satisfy Rule 9(b). Ordinarily, such claims are dismissed with leave to amend.

Here, however, the district court did not dismiss but rather granted leave to amend, stating that "to the extent that plaintiffs do not submit these amendments within thirty days, the court will entertain a renewed motion to dismiss." No amendment was submitted, and the district court never formally dismissed the claims. Plaintiffs maintain that they cured any finality problems by announcing they would stand on their complaint and would not amend.

Guided by the Supreme Court's directive that we employ a "practical rather than a technical construction" of § 1291's finality requirement, *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949), we have held that a plaintiff can convert a dismissal with leave to amend into a final order by electing to stand upon the original complaint. *See, e.g., Borelli v. City of Reading*, 532 F.2d 950, 951–52 (3d Cir.1976) ("Only if the plaintiff ... declares his intention to stand on his complaint ... the order become[s] final and appealable"). Plaintiffs here formally stood on their complaint, but defendants contend that this was not enough. They maintain that we lack jurisdiction because plaintiffs failed to obtain an explicit dismissal with prejudice. We do not agree.

The district court stated it would entertain a renewed motion to dismiss if plaintiffs did not amend, but gave no indication that it would reconsider its earlier rulings. It seems clear that the district court planned to dismiss with prejudice any claims not amended. Requiring plaintiffs to return to the district court now would be a wasteful elevation of form over substance. *See Schrob v. Catterson*, 948 F.2d 1402, 1407 (3d Cir.1991); *but see Hatch v. Lane*, 854 F.2d 981, 982 (7th Cir.1988). Thus, once the amendment period expired, the district court's order had the effect of dismissing the improperly pleaded claims with prejudice.

Our analysis is supported by *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct.

---

7. The courts of appeals have jurisdiction over appeals "from all final decisions of the district courts of the United States." 28 U.S.C. § 1291 (1988).

1117, 55 L.Ed.2d 357 (1978), where the United States Supreme Court addressed the effect of the parties' failure to comply with Federal Rule of Civil Procedure 58 on appellate jurisdiction. Rule 58 provides that no "decision by the [district] court that ... all relief shall be denied" is effective until the clerk of the district court prepares, signs, and enters a separate "judgment" that is both "set forth on a separate document" and noted on the docket sheet. Fed.R.Civ.P. 58. The Court held that the parties were free to waive these requirements because the timing of the appeal was not in doubt. *Id.* at 384, 98 S.Ct. at 1119. The Court noted that:

> Certainty as to timeliness ... is not advanced by holding that appellate jurisdiction does not exist absent a separate judgment. If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose.

*Id.* at 385, 98 S.Ct. at 1120.

We believe that no practical purpose would be served if we were to dismiss this appeal. Defendants do not question the timeliness of the appeal. *See Jung v. K. & D. Mining Co.*, 356 U.S. 335, 78 S.Ct. 764, 2 L.Ed.2d 806 (1958). Nor is there any doubt that the district court would, on remand, simply dismiss the defective claims left unamended, not revise its earlier reasoning. *Id.* at 337, 78 S.Ct. at 766. Therefore, we will treat the district court's order as a final dismissal.

## B. *§ 20(a) Claim*

■ Plaintiffs contend that § 20(a) does not create a separate cause of action, but rather depends entirely on the viability of § 10(b) claims. They maintain that "con-trolling person" liability can exist only if primary liability has been established as to another defendant. Therefore, once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based. We agree.

Section 20(a) imposes joint and several liability on any person who "controls a person liable under any provision of" the Securities Exchange Act of 1934.[8] The text of the statute plainly requires the plaintiff to prove not only that one person controlled another person, but also that the "controlled person" is liable under the Act. If no controlled person is liable, there can be no controlling person liability. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440–41 n. 8 (9th Cir.1987). Here the dismissal of the § 10(b) claims against UJB made it impossible to hold the individual defendants liable under § 20(a).

There being no other extant claims, we are satisfied that the district court's order was final, and that we have jurisdiction over this appeal.

## III. DISCUSSION

Plaintiffs make four principal arguments on appeal. First, they maintain that they have alleged fraud under § 10(b) with sufficient particularity, rather than mismanagement. Second, they contend that the same allegations state actionable § 11 and § 12(2) claims and are grounded in negligence rather than fraud. Third, they argue that they have properly alleged negligent misrepresentation under New Jersey law. Finally, they challenge the district court's order requiring class representative Katz to post security.

■ Our review of the district court's dismissal of the complaint for failure to state a claim upon which relief can be granted is plenary. We must accept as true the factual allegations contained in the

---

**8.** This section provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C. § 78t(a) (1988).

complaint, and may affirm the dismissal only if it appears certain that plaintiffs can prove no set of facts that would entitle them to relief. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988). We also have plenary review of the district court's interpretation of the federal securities laws, *Dent v. Cunningham*, 786 F.2d 173, 174 (3d Cir.1986), and its determination of New Jersey law. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Finally, we review the district court's requirement of security for abuse of discretion. 15 U.S.C. § 77k(e) (1988).

### A. *§ 10(b)*

■ Under the authority provided by § 10(b) of the Exchange Act of 1934,[9] the Securities and Exchange Commission promulgated Rule 10b–5,[10] which makes it unlawful to misrepresent or omit material information in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5 (1991). To state a claim under § 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss. *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991).

### 1. *Rule 12(b)(6)*

As we have noted, the thrust of the complaint is that UJB and the individual defendants misrepresented the true status of the company's loan loss reserves, financial health, lending practices, and internal controls. The district court found that many of the alleged misrepresentations or omissions involved either failures to predict or mismanagement—not fraud—and were not actionable under the federal securities laws.

■ The basis for the district court's decision was *In re Craftmatic Sec. Litig.*, 890 F.2d 628 (3d Cir.1990), where we held that "[w]here the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities laws." *Id.* at 640. In *Craftmatic* we provided an extensive review of the Supreme Court's jurisprudence on materiality,[11] noting that the courts are "reluctant to permit

---

**9.** Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person

directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
. . . .
(b) To use or employ, in connection with the purchase or sale of any security registered *on a national securities exchange or any secu*rity not so registered, any manipulative device or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1988).

**10.** Rule 10b–5 provides that it is unlawful for any person

directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1991).

**11.** An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In other words, the issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information" available to that investor. *Craftmatic*, 890 F.2d at 639. Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact. *TSC*, 426 U.S. at 450, 96 S.Ct. at 2133. Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ

a federal securities claim to stand when the plaintiff has failed to allege more than nondisclosure of mismanagement." *Id.* at 639.

Because it plays such a prominent role in the complaint, we will briefly discuss the nature of a loan loss reserve, which is defined in the banking trade as a

> statement of condition, or balance sheet, account set up by a bank based on its expectations about future loan losses. As losses occur, they are charged against this reserve. That is, the loan account is credited and the reserve account is debited. The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve.

American Bankers Association, *Banking Terminology* 215 (1989). There appears to be no single method of evaluating and setting loan loss reserves, perhaps because no method has proven foolproof. C. Edward McConnell, *Loan Loss Reserve Management and Unwise Lending Practices, in Bank Credit* 354 (Herbert V. Prochnow ed. 1981). Some banks set their loan loss reserves by comparing the size of the reserves to that of the loan portfolio. *See* Keith G. Turman, *Evaluating a Bank's Loan Loss Reserve Adequacy*, Internal Auditor, February 1991, at 5253. Others also analyze the quality of their loans in varying degrees of detail and according to a range of different criteria and classifications. *See, e.g., id.;* Ronald A. Stoffers, *Loan Loss Reserve Analysis: Is It Moving From Art to Science?*, Banking Policy Report, April 1, 1991, at 4; Francis X. Conway & William A. Siegenthaler, *Loan Loss Reserves: Tax, Regulatory, and Adequacy Issues*, J. of Com. Bank Lending, Sept. 1987, at 4; Victor F. Ptasznik, *Another Approach to Calculating the Loan Loss Reserve*, J. of Com. Bank Lending, April 1987, at 7; Jerry Abner, *Calculating the Loan Loss Reserve from a Watch List*, J. of Com. Bank Lending, August 1985, at 2. All techniques, however, require quantita-

tive and qualitative analyses of the past and present status of loans. *See* Conway & Siegenthaler, *Loan Loss Reserves, supra*, at 9 ("Relying on standardized, nondiscretionary formulas to aid in the determination of loan loss reserves is oversimplifying a complex problem."); *see. also* Allowance for Loan and Lease Losses for Federal Branches and Agencies, Office of Comptroller of the Currency, Banking Circular 201, Fed. Banking L.Rep. (CCH) ¶ 51,132 (May 31, 1985) (describing minimum assessment customarily undertaken by soundly managed banks). No matter what method is used, the economic judgments made in setting loan loss reserves can be validated only at some future date. McConnell, *supra*, at 354–55.

There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws. In our view a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers. *See In re Midlantic Corp. Shareholder Litigation*, 758 F.Supp. 226, 234 (D.N.J.1990). On the other hand, mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable. Similarly, if a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets, or net worth, it is not a violation of the securities laws to fail to characterize these practices as inadequate, meaningless, out of control, or ineffective. *Craftmatic*, 890 F.2d at 633 n. 5 & 640 (dismissing allegations that defendants failed to disclose general subjective assessments of controls, organization, and management information systems).

on the question of materiality is it appropriate for the district court to rule that the allegations

are inactionable as a matter of law. *Id.*

However, where a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

▪▪▪ Our decision that such general labels as "conservative" and "cautious" can be the basis for liability under Rule 10b–5 is supported by the Supreme Court's recent decision in *Virginia Bankshares, Inc. v. Sandberg,* — U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). In that case, the executive committee and board of directors of a bank approved a merger proposal that would pay its minority shareholders $42 per share. The directors solicited proxies for voting on the proposal at the company's annual meeting. In the solicitation sent to minority shareholders, the directors stated that the merger was an opportunity to achieve a "high" value at a "fair" price. *Id.* at ——, 111 S.Ct. at 2756. After the merger was approved, the plaintiff filed a complaint alleging violations of SEC Rule 14a–9, which prohibits the making of false or misleading statements of material fact in—and the omission of material facts necessary to make existing statements not false or misleading from—a proxy statement. 17 C.F.R. § 240.14a–9 (1991). Specifically, the plaintiff alleged that the directors had not in fact believed that the price offered was "high" or that the terms of the merger were "fair."

The Supreme Court rejected the defendants' argument that statements of opinion or belief were not "material." After noting that a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote, the Court commented that

> there is no room to deny that a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can take on just that importance. Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest.

*Id.* at ——, 111 S.Ct. at 2757.

If a director's statement of belief is material because of the speaker's superior knowledge, then a manager's statement of belief must also be material. A manager's knowledge and expertise regarding the day-to-day operation of his company generally exceeds that of a director, and the reasonable investor is aware of this fact. Even if management sometimes acts in its own interest, a reasonable investor need not take a manager's statement of belief at anything less than face value.

*Virginia Bankshares* also rejected the argument that statements of reasons, opinions, or beliefs are not "factual" for purposes of the securities laws. Such statements, said the Court, "are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." *Id.* at ——, 111 S.Ct. at 2758.

> Reasons for directors' recommendations or statements of belief are ... characteristically matters of corporate record subject to documentation, to be supported or attacked by evidence of historical fact outside a plaintiff's control....
>
> ....
>
> It is no answer to argue, as petitioners do, that the quoted statement on which liability was predicated did not express a

reason in dollars and cents, but focused instead on the 'indefinite and unverifiable' term, 'high' value, much like the similar claim that the merger's terms were 'fair' to shareholders. The objection ignores the fact that *such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.* Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements, and defended or attacked through the orthodox evidentiary process that either substantiates their underlying justifications or tends to disprove their existence.

*Id.* at ——, 111 S.Ct. at 2758–59 (emphasis added). For these reasons, plaintiffs here are "permitted to prove a specific statement of reason knowingly false or misleadingly incomplete, even when stated in conclusory terms." *Id.* at ——, 111 S.Ct. at 2759. We believe that the evaluations of management practices and financial well-being alleged here are as conclusory (and as provable) as those in *Virginia Bankshares.*

In this case, plaintiffs accuse defendants of knowingly or recklessly misrepresenting that they thought UJB's:

—loan loss reserves were "adequate," "adequately maintained," "strong," and "solid" (¶ 52(a), (b), (c), (e));

—loan portfolio was "well secured," "well collateralized," and of a high "quality" (¶ 52(d));

—loan to value ratio was "good" (¶ 52(d));

—loan management and underwriting practices were "conservative," "basic," "careful," "good," "prudent," and "cautious," (¶ 52(e));

—asset quality was "high," while their level of bad loans was "low" (¶ 52(d), (g)); and

—internal controls not only existed, but were properly centralized, supervised, and managed (¶ 52(f), (g), (h)). Moreover, plaintiffs allege that the published figures relating to earnings, assets, and net worth were knowingly or recklessly "overstated and inflated." ¶ 52(a). In light of our discussion, all of these statements, if made knowingly or recklessly, are actionable.

 Nevertheless, not all the allegations made in paragraph 52 are actionable. As we have noted, it is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or loan management practices.

 Moreover, as the district court recognized, some of the pivotal allegations charge defendants with essentially failing to predict the future. As we pointed out previously, "where an event is contingent or speculative in nature, it is difficult to ascertain whether the reasonable investor would have considered the omitted information significant at the time." *Craftmatic,* 890 F.2d at 643 (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 984, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted)). For example, plaintiffs allege here that UJB failed to reveal that the loan loss reserves were inadequate in light of the "high risk of non-collectibility" (¶ 52(c)); and that UJB "would be" required to add substantial amounts to its loan loss reserves in the future (¶ 52(g)). Plaintiffs do not, however, allege that defendants possessed or made affirmative forecasts regarding these possible outcomes. *See Craftmatic,* 890 F.2d at 644. Thus, there is no allegation that defendants omitted "soft information" that can, in some circumstances, be actionable. *Flynn v. Bass Bros. Enterprises,* 744 F.2d 978 (3d Cir.1984). For this reason, these particular allegations contained in subparagraphs 52(c) and (g) were properly dismissed.[12]

Having established the applicable principles of law, we would ordinarily leave it to the district court to evaluate the remaining paragraphs and subparagraphs of the com-

---

**12.** Our discussion of the strengths and weaknesses of paragraph 52 also applies to the preceding and succeeding paragraphs. Some of these allegations can, under the principles an-

plaint, including the balance of paragraph 52. However, plaintiffs' style of pleading has made it difficult to parse the complaint, primarily because many of the actionable allegations are intermingled with the inactionable. Moreover, the manner of pleading obscures what plaintiffs are in fact alleging. For example, subparagraph 52(c) alleges that UJB's "total loan reserves, particularly reserves for construction loans, were not maintained at an adequate level." This language, taken in isolation, is plainly an allegation of inactionable mismanagement. The preamble to paragraph 52, however, states that defendants made "untrue statements of material facts," and then lists several allegations, including subparagraph 52(c). It is difficult to discern whether plaintiffs are alleging that defendants made material statements that the reserves were adequate when in fact they were not, or whether plaintiffs are merely alleging that the reserves were inadequate. We are also troubled by certain syntactical problems. For example, subparagraph 52(a), in conjunction with the prefatory text, states:

> These included, among other things, the following: that the earnings, assets, and net worth of UJB were improperly and materially overstated and inflated throughout the Class Period due to grossly inadequate provisions for loan loss reserves.

It is difficult to comprehend this allegation. We do not believe that plaintiffs are alleging that the overstatement and inflation was caused by inadequate provision of loan loss reserves, yet this is what the paragraph appears to say. Similar ambiguities occur elsewhere.

Given the procedural history of this case, we would not ordinarily be disposed to offer plaintiffs yet another opportunity to revise their complaint. However, in light of the confusion that pervades plaintiffs' allegations, we conclude that the entire complaint must be reorganized. Therefore, on remand plaintiffs should rearrange the existing allegations into discrete units that are, standing alone, each capable of evaluation under the legal principles we have set forth. Because of the procedural history here, plaintiffs may not add to the existing factual allegations in making their revisions. We also note that plaintiffs in future cases of this kind should plead clearly and coherently from the outset.

### 2. *Rule 9(b)*

■ Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage. *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983). Despite these stringent requirements, the courts should be "sensitive" to the fact that application of the Rule prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." *Id.* at 99–100. They should also respect the "general simplicity and flexibility" of the Federal Rules of Civil Procedure. *Id.* at 100.

In *Christidis* we dismissed allegations that defendants knew or should have known that loan loss reserves were understated, were improperly used, and led to distortions of other financial data. Such allegations, we stated, could only succeed if, when the loan loss reserves were established, "the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices." 717 F.2d at 100. We found the allegations deficient because they had not disclosed "the manner in which, in establishing reserves for bad debts in the financial statements relied upon, defendants knowingly departed from reasonable accounting practices." *Id.* Despite three amendments, plaintiffs had

---

nounced, be the basis for a § 10(b) claim. Others suffer from the defects already identified. For example, paragraph 25 alleges that a UJB quarterly report included a statement that "United Jersey looks to the future with great optimism." This allegation is clearly inactionable

puffing. Moreover, many allegations refer to defendants' statements about specific figures. If these statements were material misrepresentations, they may be actionable; if they were merely the product of mistakes in calculation, they are not.

failed to state "[w]hat those practices are and how they were departed from." *Id.*

In *Craftmatic*, however, we recognized that:

> Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the [particularity] rule when factual information is peculiarly within the defendant's knowledge or control.

890 F.2d at 645 (citations omitted). Nevertheless, we also held that at the very least plaintiffs must allege that the necessary information lies within defendants' control. *Id.* Although acknowledging that plaintiffs here cannot be expected to plead with specificity the details of UJB's internal corporate practices, the district court dismissed the remaining allegations for failure to allege defendants' exclusive control over this information. The complaint does not specifically allege that defendants have exclusive control of information plaintiffs require.[13]

 Had the complaint contained a boilerplate allegation that plaintiffs believe the necessary information "lies in defendants' exclusive control," it still would not have satisfied Rule 9(b). As we have noted, even under a more relaxed application of the rule, plaintiffs must accompany such an allegation with a statement of facts upon which their allegation is based. *Craftmatic*, 890 F.2d at 645; *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989); 2A James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶ 9.03[1] at 9–29 to 9–29 (1991) ("where the facts are in the exclusive possession of the adversary, courts should permit the pleader to allege the facts on information and belief, provided a statement of the facts upon which the belief is founded is proffered"). To avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity. This requirement is intended to ensure that plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint. We will allow plaintiffs another opportunity to meet this standard.[14] Accordingly, we will reverse the district court's dismissal of subparagraphs 52(d), (e), (h) and (i) on Rule 9(b) grounds.

**B.** *§§ 11 and 12(2)*

Count II alleges that UJB's Dividend Reinvestment and Stock Purchase Plan ("the DRISP") and the accompanying prospectus and registration statement were false and misleading, and that plaintiffs purchased UJB stock "pursuant to" all three documents.[15] Under the DRISP, shareholders reinvested their dividends by purchasing additional UJB shares. *See* App. at 438. Some of these new shares were authorized but previously unissued treasury stock, but

---

13. The allegations cited by plaintiffs do not assert that the necessary information lies exclusively within defendants' control. Brief of Appellant Shapiro at 40 n. 13. Rather, they allege only that defendants had access—but not exclusive access—to company information when the alleged misrepresentations and omissions occurred. *See* Complaint ¶ 6 (alleging that individual defendants had "access" to non-public information at the time of the alleged misstatements and omissions); ¶ 51 (alleging that "[t]he true financial and operating condition of UJB, which was known or recklessly disregarded by defendants, remained concealed from the investing public" during the class period); ¶ 53 (alleging that defendants "could have obtained" knowledge of the facts during the Class period); and ¶ 58 (alleging that the plaintiffs would not have bought UJB securities during the Class period if they had known of materially adverse information "which was not disclosed by defendants").

14. Despite our reversal of the district court's dismissal on Rule 12(b)(6) grounds of subparagraphs 52(a), (b), (c), (f), and parts of subparagraphs 52(d) and (e), defendants urge us to affirm the dismissal on Rule 9(b) grounds. We leave it to the district court to evaluate in the first instance the particularity of these allegations.

The district court also dismissed Count II, which alleges that defendants violated §§ 11, 12(2), and 15, "to the extent that it relies on the points raised in" paragraph 52. Slip op. at 7. Our analysis with respect to Count I of the materiality and particularity of the fact allegations made in that paragraph also applies to Count II.

15. The key paragraphs of Count II are:

61. Class Plaintiff Jerome Katz, who purchased UJB's common stock during the Class

others were purchased by UJB in the secondary market. *Id.*

### 1. *Rule 12(b)(6)*

#### a. *§ 11*

■ Under § 11 of the Securities Act, any person acquiring a security issued pursuant to a false or misleading registration statement may recover damages. *See* 15 U.S.C. § 77k. Plaintiffs allege that they purchased UJB stock "pursuant to" a DRISP registration statement. The district court dismissed this claim, holding that although plaintiffs need not prove their shares are traceable to a false or misleading registration statement at this early stage of the litigation, they must allege it. We agree that traceability must be alleged, but our review of plaintiffs' complaint leads us to conclude that this has been done.

If plaintiffs' shares were purchased in the secondary market, they would not be linked to a registration statement filed during the class period, and the § 11 claim would fail. Before discovery takes place, however, it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market. The complaint alleges that the shares were purchased "pursuant to" the DRISP. At some point, plaintiffs may be able to prove that their DRISP shares came from treasury stock. Because we cannot say that plaintiffs can prove no set of facts that would entitle them to relief, the § 11 claim cannot be dismissed at this time.

#### b. *§ 12(2)*

■ Section 12(2) provides that a person who "offers or sells" securities by means of a prospectus or oral communication that misrepresents or omits material facts is liable to the person "purchasing such security from him." 15 U.S.C. § 77*l* (1988). The district court dismissed the § 12(2) claim, finding insufficient plaintiffs' allegation that defendants were "sellers" within the meaning of the statute.

In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court held that the term "seller" under § 12(1) is not limited to the person who passes title to the security, but includes anyone "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078. In *Craftmatic* we extended *Pinter* to § 12(2). We interpreted *Pinter* as having held that

> the term "solicitation" does not encompass all activities related to the purchase transaction . . .
>
> . . . .
>
> Thus, although an issuer is no longer immune from § 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus. The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller.

890 F.2d at 636. We upheld allegations that each defendant "either sold [the] securities directly to plaintiffs . . . or solicited plaintiffs . . . and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner(s) of [the] securities." *Id.* at 637.

period pursuant to the Company's Dividend Reinvestment Plan, bring [sic] this Count against defendant UJB on behalf of those members of the Class who purchased during the Class Period the Company's common stock pursuant to the DRISP prospectus.
 62. In connection with the sale of the Company's common stock pursuant to the DRISP prospectus, defendant UJB was the 'seller' of such stock, within the meaning of Section 12(2) of the Securities Act of 1933.

 63. The DRISP prospectus offering and describing the securities of UJB was false and misleading, *inter alia,* in the particulars previously described.
 64. In ignorance of the false and misleading nature of the representations described above, members of the Class purchased UJB securities issued pursuant to the foregoing registration statements and prospectuses.
The remaining paragraphs of Count II allege damage and petition for relief.

■ Plaintiffs' complaint briefly describes the DRISP and alleges that "[i]n connection with the sale of the Company's common stock pursuant to the DRISP prospectus, defendant UJB was the 'seller' of such stock, within the meaning of § 12(2)." The district court held that this allegation was defective because plaintiffs must demonstrate "direct and active participation in the solicitation of the immediate sale." It found no factual allegation specifying how UJB had directly and actively participated in the immediate sale, and noted that the mere preparation of a prospectus was insufficient under *Craftmatic.* We disagree.

These plaintiffs were not required to allege that UJB directly "solicited" the sales. The *Pinter/Craftmatic* solicitation rule applies only when the defendant issuer is not in direct privity with the purchaser. *Pinter* adopted solicitation liability as an expansion of the restrictive view that § 12 extended only to sellers in direct privity. 486 U.S. at 644, 108 S.Ct. at 2077. In *Craftmatic,* because the securities were purchased from an underwriter acting as a middleman, the defendant was not in privity with plaintiffs. Here, however, the newly offered shares purchased through the DRISP were sold directly to plaintiffs by UJB. *See* App. at 438 ("Purchases of UJB Common Stock may be made directly from UJB or on the open market, at the discretion of senior management of UJB.").[16] Because plaintiffs need not allege that UJB directly and actively participated in solicitation of the purchase,[17] they have adequately alleged that UJB was a "seller" within the meaning of § 12.

### 2. *Rule 9(b)*

■ The district court held that the § 11 and § 12(2) allegations in Count II "sounded in fraud" and that Rule 9(b) applies. We agree.

Count II incorporates by reference all preceding factual allegations, including those delineating defendants' "intent." It also states that the DRISP prospectus was false and misleading "in the particulars previously described," and mentions the false and misleading nature "of the representations described above." Complaint ¶¶ 62–63. Although Count II does not allege fraudulent intent or recklessness (a prerequisite to a successful fraud claim), neither does it allege negligence. The specific factual allegations upon which Count II is based do, however, repeatedly aver that defendants "intentionally," "knowingly," or "recklessly" misrepresented and omitted to represent certain material information. For example, paragraph 53, which expressly purports to characterize all of the complaint's factual allegations, asserts that:

> Each of the defendants, by action as hereinabove described, did so knowingly or in such a reckless manner as to constitute a willful deceit and fraud upon plaintiffs and the members of the Class. With knowledge or reckless disregard of the true financial and operating condition of UJB, the Individual Defendants caused the reports, statements and releases, to contain misstatements and omissions of material fact as alleged herein ...

Complaint ¶ 53. The only reasonable conclusion that can be drawn is that plaintiffs charge defendants with fraud. There is not a hint in the allegations that defen-

---

**16.** Because the DRISP prospectus provided that the shares would be purchased either directly from UJB *or* on the open market, the district court dismissed the § 12(2) claim because of plaintiffs' failure to "trace" their securities to an initial public offering. Our earlier analysis of traceability applies here. We therefore assume (for purposes of defendants' motion to dismiss) that plaintiffs' shares did not come from the secondary market, and that plaintiffs have sufficiently traced their shares to the DRISP prospectus. If defendants were eventually to prove that the shares came from the secondary market, § 12(2) would not apply, and judgment would be entered for them. *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

**17.** While we believe that plaintiffs should have alleged that UJB was a "direct" seller, they did allege that they bought their stock "pursuant to the DRISP prospectus." It is reasonable to infer from this allegation that plaintiffs did not purchase their shares through an intermediary. Judge Becker would hold that the present allegation is inadequate and that plaintiffs should have alleged specifically that UJB was a "direct" seller.

dants were negligent in violating §§ 11 and 12(2).[18]

Plaintiffs contend that because Count II does not mention the intent required for fraud, we must necessarily infer that the claims are grounded in negligence. As defendants point out, however, Rule 9(b) refers to "averments" of fraud, and thus requires us to examine the factual allegations that support a particular legal claim. Plaintiffs also maintain that their incorporation by reference of earlier factual allegations should not "contaminate" Count II. We agree that a pleader should not be penalized for economizing. Here, however, only one paragraph preceding Count II refers to the DRISP. Quite simply, plaintiffs did not allege ordinary negligence there or anywhere else.

Moreover, we are not presented with a "mixture of allegations of negligence, fraud, and the misleading nature of" certain communications. *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D.Mich.1985). As we have noted, the complaint is devoid of allegations that defendants acted negligently in violating §§ 11 and 12(2). Instead, it brims with references to defendants' intentional and reckless misrepresentation of material facts. We see no way to construct a negligence cause of action here.

Next we determine whether Rule 9(b) applies to § 11 and § 12(2) claims grounded in fraud, a question not yet decided in this court. *See Craftmatic*, 890 F.2d at 645 n. 28 (leaving question open with regard to § 12(2)). It is clear that neither fraud nor mistake is a necessary element of either statutory cause of action. Under § 12(2) defendants may be held liable for negligent misrepresentation or omission. *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687–88 (3d Cir.1991); *Craftmatic*, 890 F.2d at 645 n. 28 (citing *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 208–09, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976)). The same is true of § 11. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). By its plain wording, Rule 9(b) would not appear to apply to claims that a defendant negligently violated §§ 11 and 12(2); we need not and do not decide this issue. On the other hand, the plain language of the rule clearly encompasses § 11 and § 12(2) claims based on fraud like those before us. *See, e.g., Sears v. Likens*, 912 F.2d 889, 892–93 (7th Cir.1990) (applying Rule 9(b) to § 12(2) claim). We see no valid reason to create a special exception to Rule 9(b) for such claims. Accordingly, we hold that when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies.

The district court did not address whether plaintiffs' § 11 and § 12(2) allegations were pleaded with sufficient particularity. Although we will remand for full consideration of this issue, we offer the following guidance. The most serious flaw in the § 11 claim went unnoticed by the parties. Section 11 imposes liability for false or misleading statements made in "registration statements." 15 U.S.C. § 77k (1988). Paragraph 61 of the complaint alleges that Katz and those he represents purchased UJB stock pursuant to a DRISP "prospectus," not a registration statement. A prospectus generally makes up the bulk of the registration statement, contains nearly identical information, and serves many of the same disclosure purposes. However, it is a distinctly separate document under the federal securities laws. Paragraph 64 alleges that members of the class purchased UJB stock "pursuant to the foregoing registration statements," but no reference to a registration statement precedes paragraph 64. Indeed, paragraph 33 of the complaint describes the issuance of only a "prospec-

---

**18.** Buried in paragraph 13, which avers that common questions of law and fact predominate, is a brief mention of "whether the defendants acted willfully, recklessly or with gross negligence in omitting and/or misrepresenting material facts or in aiding and abetting the making of misstatements." It would be unreasonable to infer a negligence cause of action from this

fleeting and obscure reference to "gross negligence." *Cf. United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). This conclusion is confirmed by plaintiffs' failure to cite to paragraph 13 when arguing that their § 11 and § 12(2) claims sound in negligence rather than fraud. *See* Brief of Appellant Katz at 9–18.

tus" in connection with the DRISP. Thus, these allegations, even if true, do not provide even the "short and plain statement of the claim showing that the pleader is entitled to relief" required by Rule 8(a)(2), let alone the notice required by Rule 9(b).

The § 12(2) claim does identify the offending prospectus, but is only slightly more informative than the § 11 allegations. The complaint neither identifies which allegedly false statements violated § 12(2) nor explains how they were false. Under Rule 9(b), a plaintiff must allege the manner in which a defendant knowingly departed from the truth. *Christidis*, 717 F.2d at 100. As already noted, we are sensitive to the fact that premature application of Rule 9(b) can permit sophisticated defrauders to conceal fraud. *Id.* at 99–100. We are also aware that in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. *Craftmatic*, 890 F.2d at 645. Nevertheless, "even under a non-restrictive application of the rule, pleaders must alleged that the necessary information lies within the defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Id.* The district court should, on remand, evaluate the particularity of the § 11 and § 12(2) claims in light of these comments.

## C. *Negligent Misrepresentation*

 The district court dismissed plaintiffs' supplementary state law claim for negligent misrepresentation, holding that New Jersey law does not extend this cause of action to the general investing public. We disagree.

Under New Jersey common law, persons who negligently misrepresent material facts may be held liable to those who, as a result of their justifiable reliance on such misrepresentation, suffer *economic harm*. *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138, 142–43 (1983). In *Rosenblum* the New Jersey Supreme Court held

that a buyer of stock may sue a corporation's outside auditor for negligent misrepresentations regarding the corporation's financial statements. In an exhaustive discussion, the court rejected the view that the plaintiff must be in privity with the auditor. Instead, "the independent auditor ... has a duty to all those whom that auditor should reasonably foresee as recipients from the company of the statements for its proper business purposes." *Id.* at 142; *see also id.* at 146.

*Rosenblum* takes an expansive view of the range of permissible plaintiffs in a negligent misrepresentation action. It explicitly rejects the majority view that the plaintiff must be in privity, and adopts the more inclusive "reasonably foreseeable plaintiff" rule. There is no dispute here that the average investor was a reasonably foreseeable recipient of defendants' statements about UJB. Defendants argue instead that investment by the general public is not a "proper business purpose." To state the argument is to note its defects. As one court has explained,

> Defendants ... seek to parse out a subtle distinction between a "business decision" and an "investment decision." These terms ... distinguish between an audit statement sent directly to an institutional investor to induce an investment and audit reports released to the general public for the same purpose. The contention is that the former investors are covered under the negligent misrepresentation doctrine while the ordinary public investor remains unprotected. *Rosenblum* makes no such distinction between these classes of reasonably foreseeable plaintiffs.

*In re Midlantic Shareholders Litig.,* 758 F.Supp. 226, 237 n. 9 (D.N.J.1990).[19] Indeed, the *Rosenblum* court expressly stated that information sent to stockholders could be the basis of liability:

> When the defendants prepared the Giant audit, they knew ... that it was to be incorporated in Giant's annual report, a

---

**19.** At least four other district courts have held that New Jersey provides a negligent misrepresentation cause of action to the investing public.

*See Urbach v. Sayles,* No. 91–1291, 1991 WL 236183 at *10–*11 (D.N.J. Sept. 4, 1991); *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254

report that would be transmitted to each Giant stockholder.... The defendants also knew or should have known that the audited financial statements would be available and useful for *other proper business purposes,* such as public offerings of securities ...

461 A.2d at 154 (emphasis added). Moreover, the court looked to the expansive liability under the federal securities laws as a model for New Jersey law. *Id.* at 151. Therefore, it is not accurate to say that *Rosenblum*'s "business purpose" requirement limits the cause of action to those who make "significant" investments.

In sum, we find that the New Jersey Supreme Court intended to part company with the majority of states that allow only plaintiffs who are in direct privity to sue for negligent misrepresentation. Therefore, we hold that this cause of action extends to foreseeable individual investors who, as a result of their reliance on negligently made misrepresentations, suffer economic loss.[20]

D. *Security*

▮ Under § 11(e) of the Securities Act, a district court "may, in its discretion,

require an undertaking for the payment of the costs of [a Securities Act] suit, including reasonable attorney's fees."[21] The district court ordered plaintiff Katz to post a $50,000 bond in connection with the § 11 and § 12(2) claims. We review this aspect of the district court's order for abuse of discretion.

The principal purpose of § 11(e) is to deter plaintiffs from bringing meritless actions solely to procure a favorable settlement. *Phillips v. Kidder, Peabody & Co.,* 686 F.Supp. 413, 416 (S.D.N.Y.1988); *see also Hochfelder,* 425 U.S. at 211 n. 30, 96 S.Ct. at 1389. Defendants concede that § 11(e) security is typically required "when the plaintiffs' action 'borders on the frivolous' *or* 'is brought in bad faith.'" Brief of Appellees at 55. The district court made no finding that Katz' claims met either of these standards. As we have seen, many of these claims are sufficient to withstand a motion to dismiss. Therefore, we will vacate the district court's security requirement.

(D.N.J.1990); *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 982 (E.D.N.Y.1988); *Kronfeld v. First Jersey Nat'l Bank,* 638 F.Supp. 1454, 1467–68 (D.N.J.1986). *But see Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989).

20. In *Rosenblum,* the court commented that the negligent misrepresentation cause of action

applies by its terms only to those foreseeable users who receive the audited statements from the business entity for a proper business purpose to influence a business decision of the user, the audit having been made for that business entity. Thus, for example, an institutional investor or portfolio manager who does not obtain audited statements from the company would not come within the stated principle. Nor would stockholders who purchased the stock after a negligent audit be covered *in the absence of demonstrating the necessary conditions precedent.*

*Id.* at 153 (emphasis added). It is not clear what the court meant by "the necessary conditions precedent." Perhaps it refers to reliance and the other elements of the cause of action. In any event, it is plain that *Rosenblum* does not foreclose liability to everyday investors.

Defendants also rely on *Karu v. Feldman,* 574 A.2d 420 (N.J.1990), a post-*Rosenblum* case. This reliance is misplaced. Although *Karu* found that the plaintiff did not state a claim for

negligent misrepresentation, the decision did not turn on privity or the "business purpose" requirement. Rather, the court held that the defendant bank had not acted negligently because it had not provided certain false information to a depositor and had no duty to disclose other information. *Id.* at 427–28. *Karu* may support a finding that UJB had no duty to disclose certain information under New Jersey law, but it in no way supports the contention that a member of the investing public has no cause of action.

21. Section 11(e) provides:

... In any suit under this or any other section of this title the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorneys' fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit ... to have been *without merit,* in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

15 U.S.C. § 77k(e) (1988) (emphasis added).

## IV. CONCLUSION

For the reasons stated, we will affirm in part and reverse in part the district court's dismissal of Counts I and II and remand for proceedings consistent with this opinion. Moreover, we will affirm the district court's decision that Rule 9(b) applies to the § 11 and § 12(2) claims,[22] but will remand for further determination of the sufficiency of the applicable allegations. We will also reverse the district court's dismissal of Count III. Finally, we will vacate the district court's order insofar as it requires class representative Katz to post security.

Each side shall bear its own costs.

## SUR PETITION FOR REHEARING

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO and ROTH, Circuit Judges, and VanARTSDALEN *, District Judge.

The petition for rehearing filed by appellees in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court in banc, is denied.

> BY THE COURT,
> /s/ Anthony J. Scirica
> Circuit Judge

Dated: July 7, 1992.

---

22. The district court dismissed Count II's § 15 claim because the § 11 and § 12(2) claims to which it attached had been dismissed. In light of our revival of the latter claims, we will reinstate the § 15 claim for further consideration by the district court.

