

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-7-1997

# Weiner v. Quaker Oats Company

Precedential or Non-Precedential:

Docket
96-5404

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Weiner v. Quaker Oats Company" (1997). *1997 Decisions*. Paper 258.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/258

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 6, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5404

MYRON WEINER; NICHOLAS SITNYCKY,
on behalf of themselves and all others similarly situated

v.

THE QUAKER OATS COMPANY; WILLIAM D. SMITHBURG
(D.C. Civil No. 94-5417)

RONALD ANDERSON; ROBERT FURMAN,
on behalf of themselves and all others similarly situated

v.

THE QUAKER OATS COMPANY; WILLIAM D. SMITHBURG
(D.C. Civil No. 94-5418)

Myron Weiner, Nicholas Sitnycky, Ronald Anderson
and Robert Furman,
        Appellants

On Appeal from the United States District Court
for the District of New Jersey

Argued: February 4, 1997

Before: STAPLETON and MANSMANN, Circuit Judges,
and POLLAK, District Judge*

(Opinion filed: November 6, 1997)

_____
*Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.


        M. RICHARD KOMINS (argued)
        LEONARD BARRACK
        Barrack, Rodos & Bacine
        2001 Market Street
        3300 Two Commerce Square
        Philadelphia, PA 19103

        JOSEPH R. SAHID
        Barrack, Rodos & Bacine

575 Madison Ave.
New York, NY 10022

DAVID J. BERSHAD
ROBERT A. WALLNER
Milberg, Weiss, Bershad, Hynes &
 Lerach
One Pennsylvania Plaza
49th Floor
New York, NY 10119

 Attorneys for Appellants

FREDERIC K. BECKER
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095

DENNIS J. BLOCK (argued)
Weil, Gotshal & Manges
767 Fifth Ave.
New York, NY 10153

 Attorneys for Appellees

OPINION OF THE COURT

POLLAK, District Judge:

This case raises the question whether and in what circumstances a corporation and its officers have an obligation to investors to update, or at least not to repeat,

particular projections regarding the corporation'sfinancial situation. Plaintiffs in this securities-fraud action are purchasers of stock in The Quaker Oats Company ("Quaker") who contend that defendants, Quaker and its chief executive officer, William D. Smithburg, disseminated false or misleading information to the investment community. Plaintiffs assert that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and the Securities and Exchange Commission's Rule 10b-5, by continuing to announce or let stand certain projected figures for earnings growth and debt-to-equity ratio which defendants allegedly knew had become inaccurate in light of Quaker's planned, highly leveraged, acquisition of Snapple Beverage Corp. ("Snapple").

The district court, on motion by defendants, dismissed

the case for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons given below, the judgment of the district court will be reversed.

I.

In reviewing a judgment dismissing a complaint for failure to state a claim, all well-pleaded allegations are taken to be true. Lorenz v. CSX Corp., 1 F.3d 1406, 1411 (3d Cir. 1993). The following recitation of the facts of this case is therefore drawn from the "Second Amended Class Action Complaint."[1]

This action was brought "on behalf of a class of persons who purchased the common stock of Quaker during the period from August 4, 1994 through and including November 1, 1994." Complaint at P 4. Plaintiffs Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman all purchased Quaker stock during the proposed class period.

Defendant Quaker is a New Jersey corporation which produces and markets a variety of consumer food products and beverages, including Gatorade soft drink. Defendant William D. Smithburg is Quaker's chairman and chief executive. The complaint asserts that, in 1994, Quaker was

_____

1. The class has not yet been certified.

widely considered vulnerable to takeover. Allegedly in order to make Quaker a less attractive candidate for takeover and thereby to protect their own positions, Quaker's management resolved to increase the company's debt by acquiring Snapple, a manufacturer of bottled juices and flavored tea products. On November 2, 1994, the two companies announced that they would combine in a $1.7 billion tender offer and merger transaction. The deal was financed entirely with new debt, significantly increasing Quaker's debt-load and making the company a far less appealing takeover prospect.[2]

A. Factual Background

Negotiations between Quaker and Snapple apparently began in the spring of 1994. As Smithburg later told Bloomberg Business News, "[R]ight after some discussions started, it was so obvious that [Snapple] had an interest and we had an interest and these two great brands, Gatorade and Snapple, [would] benefit from a put-together,

and it just snowballed from then...." Complaint at P 29. By early August 1994, Quaker had advised Snapple that it was interested in pursuing a merger of the two companies and had commenced a due diligence investigation. Id. The deal was consummated in November of that year.

Over the course of the year prior to its acquisition of Snapple, Quaker had announced in several public documents and public statements the company's expectations for earnings growth and its guideline for debt-to-equity ratio. It is these announcements, and the numbers contained therein, which form the basis for the instant action.

On October 4, 1993, in its Annual Report for the fiscal year ended June 30, 1993, Quaker included the following statement:

_____

2. According to press reports, two years after the acquisition Quaker undertook to sell Snapple -- for some $1.4 billion less than the acquisition price. See Barnaby J. Feder, Quaker to Sell Snapple for $300 Million, N.Y.Times, March 28, 1997, at D1, D16 ("Closing the books on what some analysts have called the worst acquisition in recent memory" and "touch[ing] off another round in the almost incessant takeover speculation that has surrounded Quaker in recent years").

4

One way to measure debt is to compute the ratio of [total] debt as a percent of total debt plus preferred and common shareholders' equity. Total debt includes both short-term and long-term borrowing. Our debt-to-total capitalization ratio at June 30, 1993 was 59 percent, up from 49 percent in fiscal 1992. Quaker's total debt remained essentially even. Therefore, this increase was primarily due to the decrease in the book value of common shareholders' equity which resulted from our share repurchases and the $116 million charge for adopting new accounting principles. For the future, our guideline will be in the upper-60 percent range.

Complaint at P22.

Smithburg reiterated this "guideline" in a letter contained in the same Annual Report:

[O]ur Board of Directors [has] authorized an increase in our leverage guideline, along with a share repurchase program of up to 5 million shares. Our guideline for leverage in the future will be to maintain a total debt-to-total capitalization ratio in the upper-60 percent

range.

Complaint at P 23.

Quaker's Form 10-Q for the quarter ended September 30, 1993, which was filed with the SEC in November 1993, repeated the total debt-to-total capitalization ratio guideline:

> Short-term and long-term debt (total debt) as of September 30, 1993, increased $98.6 million from June 30, 1993. The total-debt-to-total capitalization ratio . . . was 63.5 percent and 59.0 percent as of September 30, 1993 and June 30, 1993, respectively. . . . One of the Company's financial objectives is to generate economic value through the use of leverage, while maintaining a solid financial position through strong operating cash flows. The Company has decided to increase its guideline for leverage in the future to the upper-60 percent range.

Complaint at P 24.

Quaker did not, at any time before the November 1994 announcement of the acquisition of Snapple, make any public statement or public filing that amended or qualified the above quoted recitals from the 1993 Annual Report and the Form 10-Q.

On August 4, 1994, Quaker announced its financial results for the fourth quarter and the fiscal year that had ended June 30, 1994. In a published report and a public meeting, Quaker announced a growth in earnings of 5% over earnings for fiscal 1993. The Dow Jones News Wire reported that at the August 4 meeting Smithburg had stated Quaker was " `confident' of achieving at least 7% real earnings growth" in fiscal 1995. Complaint at P 27.

On September 23, 1994, Quaker disseminated its Annual Report for fiscal 1994. The report, which was incorporated into Quaker's Form 10-K filed the same day with the SEC, stated that "we are committed to achieving a real earnings growth of at least 7 percent over time." Complaint at P 33.

The 1994 Annual Report also contained a statement regarding the company's total debt-to-total capitalization ratio. Quaker noted that

> [a]t the end of fiscal 1994, our total debt-to-total capitalization ratio was 68.8 percent on a book-value

        basis, in line with our guideline in the upper-60
        percent range.

Complaint at P 32.

On November 2, 1994, Quaker and Snapple announced
that Quaker would acquire Snapple in a tender offer and
merger transaction for $1.7 billion in cash. Subsequent to
this announcement, the price of Quaker stock fell $7.375
per share -- approximately 10% of the stock's value.
Complaint at P 34.

To finance the acquisition, Quaker had obtained a $2.4
billion credit from a banking group led by NationsBank
Corp. The Snapple acquisition nearly tripled Quaker's debt,
from approximately $1 billion to approximately $2.7 billion.
The acquisition also increased Quaker's total debt-to-total
capitalization ratio to approximately 80%. Complaint at
P 35.

Securities analysts suggested that the merger would
make Quaker less attractive as a takeover target. One noted
that "[Quaker's] takeover potential seems quite low,"
another that "[i]t was a do-or-die deal. Quaker had to buy
something or they were going to be taken out." A third
asserted that "[i]t is clearly a defensive move. They're paying
a fair amount for Snapple. Suddenly someone can't swoop
in and buy up Quaker. Even a leveraged buyout investor
can't break things up because of a huge gorilla like
Snapple." Complaint at P 35.

B. Procedural History

On November 10, 1994, purchasers of Quaker stock in
the period before the Snapple acquisition filed two actions,
which were later consolidated, in federal court in New
Jersey. In each action, plaintiff stock purchasers alleged
that defendants Quaker and Smithburg had violated
sections 10(b) and 20(a) of the Securities Exchange Act of
1934,3 15 U.S.C. SS 78j(b) and 78t, and the Securities and
Exchange Commission's Rule 10b-5,4 17 C.F.R. S 240.10b-
5. Plaintiffs maintained that defendants had known that
the impending purchase of Snapple would drive Quaker's
total debt-to-total capitalization ratio up and earnings
growth down, but had nonetheless failed to adjust their
public projections for those figures. This failure, plaintiffs

_____

3. Section 10(b) prohibits the "use or employ[ment], in connection with
the purchase or sale of any security, . . . [of] any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. S 78j(b). Section 20(a) provides liability for "controlling persons" in a corporation.
15 U.S.C. S 78t(a).

4. Rule 10b-5 provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the
use of any means or instrumentality of interstate commerce, or of
the mails or of any facility of any national securities exchange, .
. .

. . . .

(b) To make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements
made, in the light of the circumstances under which they were
made, not misleading . . . , in connection with the purchase or sale
of any security.

claimed, had artificially inflated the price of Quaker's stock in the period from August 4 to November 1, 1994. Keeping the stock price up during this period, plaintiffs alleged, had kept Quaker from itself being taken over. When the deal with Snapple was revealed, and the price of Quaker stock fell to reflect what plaintiffs maintain was the true value of a company that had just taken on an additional $1.7 billion in debt, investors who had believed defendants' representations as to growth and total debt-to-total capitalization ratio projections experienced a 10% loss in the worth of their stock.

On July 27, 1995, defendants moved, under Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss plaintiffs' Second Amended Class Action Complaint. Plaintiffs filed a memorandum in opposition, and Quaker and Smithburg responded with a reply brief and a document entitled "Supplemental Affidavit of Dennis J. Block." Plaintiffs moved to strike certain documents appended to the Supplemental Affidavit on the ground that plaintiffs had neither quoted nor relied upon the documents in the complaint. On May 23, 1996, the district court denied the motion to strike and dismissed the complaint for failure to state a claim.5 In so ruling, the court found immaterial as a matter of law Quaker's statements concerning the company's "guideline" for the ratio of total debt-to-total capitalization that it would maintain in 1995

and the projection of 7% earnings growth in 1995. It
further found that the latter figure was per se reasonable
because Quaker's average annual earnings growth over the
previous five years had exceeded 7%. The court therefore
decided that there had been no violation of S 10(b) or Rule
10b-5 and that, because a S 20(a) claim could not be
sustained absent a finding of liability underS 10(b), the
S 20(a) claim would also be dismissed. This appeal followed.

On appeal, plaintiffs challenge the district court's
determination that Quaker's statements concerning the
company's total debt-to-total capitalization guideline were
immaterial, and that Quaker's projections of earnings

_____

5. Because it dismissed the case under Rule 12(b)(6), the court found
moot defendants' motion to dismiss under Rule 9(b).

growth were (a) per se reasonable and (b) per se immaterial.
In addition, plaintiffs contest the district court's ruling that
Quaker's Schedules 14D-1 and 14D-9, documents filed
with the SEC soon after the acquisition of Snapple, could
be considered on a motion to dismiss.6  Defendants in turn
press the argument that Federal Rule of Civil Procedure
9(b) offers an alternative ground upon which to affirm the
district court's dismissal of the complaint.

C. Jurisdiction

The district court had jurisdiction pursuant to 15 U.S.C.
SS 78aa and 28 U.S.C. S 1331. We have jurisdiction over the
appeal pursuant to 28 U.S.C. S 1291.

In examining the grant of a motion to dismiss pursuant
to Rule 12(b)(6), we exercise plenary review. Lorenz, 1 F.3d
at 1411. In so doing, we must accept the allegations of the
complaint as true and draw all reasonable inferences in the
light most favorable to plaintiffs. Id. We may affirm only if
it appears certain that plaintiffs could prove no set of facts
supporting their claim which would entitle them to relief.
See Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 273
(3d Cir. 1985).

II.

The Supreme Court has had frequent occasion to observe
that "the fundamental purpose of the [Securities Exchange]
Act [was] `to substitute a policy of full disclosure for the
philosophy of caveat emptor . . . .' " Santa Fe Industries, Inc.
v. Green, 430 U.S. 462, 477 (1977) (quoting Affiliated Ute

Citizens v. United States, 406 U.S. 128, 151 (1972), in turn
quoting SEC v. Capital Gains Research Bureau, 375 U.S.
180, 186 (1963)); see also Basic, Inc. v. Levinson, 485 U.S.
224, 230 (1988). Rule 10b-5, promulgated pursuant to
S 10(b) of the Act, provides the framework for a private
cause of action for violations involving false statements or
omissions of material fact. See Basic, at 230-31. To
establish a valid claim of securities fraud under Rule 10b-5,

_____

6. There is no indication in plaintiffs' briefs that they seek to appeal
from
the district court's dismissal of the S 20(a) "controlling person" claim
against Smithburg.

9

plaintiffs "must prove that the defendant[s] (1) made
misstatements or omissions of material fact; (2) with
scienter; (3) in connection with the purchase or sale of
securities; (4) upon which plaintiffs relied; and (5) that
plaintiffs' reliance was the proximate cause of their injury."
Kline v. First Western Government Securities, Inc., 24 F.3d
480, 487 (3d Cir.), cert. denied, 513 U.S. 1032 (1994); see
also In re Phillips Petroleum Securities Litigation, 881 F.2d
1236, 1244 (3d Cir. 1989).

In the present litigation, the plaintiffs allege that during
the proposed class period they purchased shares in reliance
on statements made by Quaker and Smithburg about (1)
Quaker's guideline for the ratio of total debt-to-total
capitalization (in the upper 60 percent range) governing the
company's financial planning and (2) Quaker's expected
earnings growth in fiscal 1995.

The statements about expected earnings growth were
made in August and September of 1994 -- at the
commencement of, and mid-way through, the proposed
class period -- and it is plaintiffs' contention that, at a
point when Quaker was in active pursuit of Snapple,
Quaker and Smithburg must have known that the
projections were illusory.

The statements about the guideline for the ratio of total
debt-to-total capitalization were made either prior to the
proposed class period or during the class period as a
description of completed events. Plaintiffs' central complaint
with respect to these statements is that, when the Snapple
negotiations went into high gear, Quaker and Smithburg
had to have known that a total debt-to-total capitalization
ratio in the high 60 percent range was no longer a realistic
possibility. At that point, plaintiffs contend, defendants had

a duty publicly to set the guidelines record straight.

We will first consider the statements regarding Quaker's guideline for the ratio of total debt-to-total capitalization. Then we will turn to the statements about expected growth in earnings.

A. The Total Debt-to-Total Capitalization Ratio Guideline

Plaintiffs' claims under this heading are claims of nondisclosure. "When an allegation of fraud under section

10(b) is based upon a nondisclosure, there can be no fraud absent a duty to speak." Lorenz, 1 F.3d at 1418. In general, Section 10(b) and Rule 10b-5 do not impose a duty on defendants to correct prior statements -- particularly statements of intent -- so long as those statements were true when made. See In re Phillips Petroleum, 881 F.2d at 1245. However, "[t]here can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised." Id. To avoid liability in such circumstances, "notice of a change of intent [must] be disseminated in a timely fashion." Id. at 1246. Whether an amendment is sufficiently prompt is a question that "must be determined in each case based upon the particular facts and circumstances." Id.

In the present case, plaintiffs allege that defendants' statements in the months leading up to the merger with Snapple improperly omitted mention of a planned increase in the total debt-to-total capitalization ratio guideline. The district court, discounting the allegation, found that "[n]o reasonable investor could interpret the Leverage[total debt-to-total capitalization] Ratio Guideline as an absolute restriction on Quaker's ability to take advantage of a corporate opportunity which might cause Quaker to exceed the Leverage [total debt-to-total capitalization] Ratio Guideline." 928 F. Supp. at 1386. On this appeal, in urging the correctness of the district court's determination, defendants contend that plaintiffs are unable to establish the first element of a claim under S10(b) and Rule 10b-5: the materiality of defendants' repetition of Quaker's "upper 60-percent range" total debt-to-total capitalization ratio guideline after the merger with Snapple became a probability.

1. Materiality

The Supreme Court set forth the standard for materiality of an omitted statement under S 10(b) and Rule 10b-5 in

Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Plaintiffs in Basic had been stockholders in Basic Incorporated, a company whose directors, in December of 1978, approved a friendly tender offer from Combustion Engineers to acquire Basic's common stock. The December 1978 announcement was the culmination of over two years of

11

negotiations between Basic and Combustion -- a period during which Basic on three occasions publicly denied that merger discussions or other developments likely to have significant effect on share values were pending. Plaintiffs sold their holdings in Basic subsequent to the first of Basic's public denials. After the merger, plaintiffs sued Basic and those who had been Basic directors during the two years leading up to the merger. Plaintiffs alleged that Basic's public denials were material misrepresentations which had, to plaintiffs' detriment, weakened the market in Basic's stock.

In Basic, the Court adopted in the context of S 10(b) and Rule 10b-5 the standard of materiality set forth in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976), a case arising under S 14(a) of the 1934 Act. See Basic, 485 U.S. at 232. The Basic Court approved, for cases involving undisclosed merger plans, the principle that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [proceed]." Id. at 231 (quoting TSC Industries, 426 U.S. at 449). Under this standard, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Id.

In Basic, the Court rejected a proposed bright-line test that "preliminary merger discussions do not become material until `agreement-in-principle' as to the price and structure of the transaction has been reached between the would-be merger partners." Basic, 485 U.S. at 233. In its place, the Court called for a fact-specific inquiry: "Whether merger discussions in any particular case are material . . . depends on the facts. . . . No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." Id. at 239.

Subsequent to Basic, this court has had occasion to address with greater particularity the standard of materiality to be applied, in a securities-fraud action, to a motion to dismiss: "[M]ateriality is a mixed question of law

and fact, and the delicate assessments of the inferences a

reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." Shapiro v. UJB Financial Corp., 964 F.2d 272, 281 n.11 (3d Cir.), cert. denied, 506 U.S. 934 (1992). Therefore, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Id.

Applying the standard set forth in Shapiro to the pending case, we note first that the emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings. The complaint identifies three separate documents in which Quaker described its total debt-to-total capitalization ratio policy: the 1993 Annual Report issued October 4, 1993 ("Our guideline for leverage in the future will be to maintain a total debt-to-total capitalization ratio in the upper-60 percent range"), Complaint at P22; the Form 10-Q filed in November 1993 ("The Company has decided to increase its guideline for leverage in the future to the upper-60 percent range"), Complaint at P 24; and the 1994 Annual Report issued September 23, 1994 ("At the end of fiscal 1994, our total debt-to-total capitalization ratio was 68.8 percent on a book-value basis, in line with our guideline in the upper-60 percent range"), Complaint at P 32. None of these statements was actually incorrect at the time of its publication. Even the last, which plaintiffs assert was "false when made," in isolation appears a straightforward statement of fact; there is no indication that as of the end of fiscal 1994 Quaker's total debt-to-total capitalization ratio was anything but 68.8%.

But, of course, the statements were not made in isolation. Rather, by including the total debt-to-total capitalization ratio guideline in the 1993 Annual Report -- indeed, by setting it forth in at least three separate places in that document -- Quaker may well have created the reasonable understanding among investors that the ratio guideline was a number to which Quaker attached considerable significance. And any such understanding could well have been reinforced by the iteration of the ratio guideline in the November 1993 Form 10-Q and the 1994

Annual Report published on September 23, 1994. Taken together, the statements could indeed have induced a reasonable investor to expect either that the ratio guideline would remain in "the upper-60 percent range," or that Quaker would announce any anticipated significant change. That is, it would have been entirely reasonable for an investor to assume that if defendants believed, as of September 23, 1994, that Quaker's total debt-to-total capitalization ratio would soon change significantly, the company would have said so in its Annual Report forfiscal 1994 issued on that date. As noted earlier, Smithburg had stated in a letter contained in Quaker's 1993 Annual Report that "[o]ur guideline for leverage in the future will be to maintain a total debt-to-total capitalization ratio in the upper-60 percent range" (emphasis added); there is no evident reason to confine the phrase "in the future" to the single year after the initial announcement.

In sum, in the present case, we find that a trier of fact could conclude that a reasonable investor reading the 1993 Annual Report published on October 4, 1993, and then the 1994 Annual Report published on September 23, 1994, would have no ground for anticipating that the total debt-to-total capitalization ratio would rise as significantly as it did in fiscal 1995. There was after all no abjuration of the "upper 60-percent range" guideline. The company had predicted the rise from 59 percent to the "upper 60-percent range" in the 1993 report and that rise had occurred by and was confirmed in the 1994 report. Therefore, it was reasonable for an investor to expect that the company would make another such prediction if it expected the ratio to change markedly in the ensuing year.

The district court held that "[t]o require Quaker to disclose the possibility it might seek loans to finance an acquisition is tantamount to requiring the disclosure of the acquisition negotiations." 928 F. Supp. at 1383. But plaintiffs do not argue that Quaker should have stated that the guideline would be adjusted "to finance an acquisition." The more relevant question is whether Quaker could have communicated a projected increase in the level of the total debt-to-total capitalization ratio guideline without alerting investors to the impending merger with Snapple. There is

14

reason to believe Quaker had the ability to do just that. The company had announced plans to increase the ratio substantially in its 1993 Annual Report for a variety of reasons unrelated to acquiring other companies. Quaker then observed in its 1994 Annual Report, in a paragraph discussing the ratio guideline, that among other things

"increased debt" had allowed the company to "acquire four businesses." Defendants do not argue that the 1993 announcement alerted investors to Quaker's potential acquisition of these four businesses. Thus, Quaker's own actions strongly suggest that a change in a ratio guideline can be projected without explicitly or implicitly alerting the investment community.

Furthermore, even if an announced change in the ratio guideline would have alerted the reasonably savvy investor to an imminent acquisition, the Supreme Court has made clear that it is not the role of the courts to interfere with the policy of disclosure "chosen and recognized" in the securities laws. Basic, 485 U.S. at 234. "We think that creating an exception to a regulatory scheme founded on a prodisclosure legislative philosophy, because complying with the regulation might be `bad for business,' is a role for Congress, not this Court." Id. at 240 n.17.

We recognize that it is quite likely that Quaker and Snapple had not yet agreed on the precise terms of their merger by the beginning of August 1994, or indeed even until shortly before the deal was announced on November 2 of that year. But plaintiffs do not allege that the terms of the agreement were set by the opening of the proposed class period in early August. Instead, they urge that, whatever the terms of the agreement may have been by the time of the purported false or misleading statements, it must by then have been clear to defendants that the merger would compel Quaker to take on sufficient additional debt to raise the total debt-to-total capitalization ratio to a level far higher than the "upper-60 percent" range. 7 We think that a fact-finder could so find.

_____

7. Therefore, it makes no difference to the outcome of this appeal whether the district court erred in considering Quaker's Schedule 14D-1 and Schedule 14D-9, which were apparently filed two days after the

15

We hold, therefore, that defendants have failed to establish that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. The complaint alleges facts on the basis of which a reasonable factfinder could determine that Quaker's statements regarding its total debt-to-total capitalization ratio guideline would have been material to a reasonable investor, and hence that Quaker had a duty to update such statements when they became unreliable.8

2. Rule 9(b)

announcement of the merger. These documents, defendants argue, include statements that "through September and October 1994" Quaker and Snapple continued to discuss "alternative structures for the transaction," including one scenario "that would have provided for partial payment in Quaker stock." We note that defendants do not argue that this alternative structure would have made the deal one paid for entirely by stock -- or even primarily by stock. That is, defendants do not argue that at any time during the proposed class period Quaker believed that the amount of debt that it would have to assume as a result of the merger would be so small as to have no significant impact on the company's total debt-to-total capitalization ratio. Accordingly, consideration vel non of the Schedule 14D-1 and Schedule 14D-9 does not affect the outcome of this appeal, and we need not answer the question whether the district court properly addressed the documents in deciding the motion to dismiss.

8. Defendants also argue that plaintiffs failed adequately to plead scienter, a necessary element of any 10b-5 action. Scienter "need not be [pleaded] with `great specificity.' " In re Time Warner Securities Litigation, 9 F.3d 259, 268 (2d Cir. 1993) (quoting Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985)), cert. denied, 511 U.S. 1017 (1994). It may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. See id. at 269. The complaint alleges that Quaker's management took advantage of specific opportunities to communicate with the investment community in order to inflate the price of Quaker stock, fend off a widely-rumored potential takeover, and preserve management's own jobs. Because the complaint therefore sets forth facts establishing both motive and opportunity to commit fraud, we hold that plaintiffs have adequately alleged scienter.

16

the complaint's alleged lack of compliance with the requirements of Federal Rule of Civil Procedure 9(b).9 That rule dictates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or malice shall be stated with particularity." Our cases warn, however, that "focusing exclusively on the particularity requirement is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989). Because, in cases alleging corporate fraud, "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs," we

have relaxed the particularity rule "when factual information is peculiarly within the defendant's knowledge or control." Id. Nevertheless, "even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." Id.

In Craftmatic, we held that where a projection is alleged to have been issued "without a reasonable basis" and "knowingly and recklessly," a complaint must allege not only "the dates, the speaker, and the actual projections at issue" and that "there was no reasonable basis for the projections," but also "facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control." Id. at 646. In Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992), we refined the Craftmatic standard, holding that "a boilerplate allegation that plaintiffs believe the necessary information `lies in defendants' exclusive control,' " if made, must be accompanied by "a statement of facts upon which

_____

9. Defendants are free to make such an argument despite the absence of a cross-appeal. See Colautti v. Franklin, 439 U.S. 379, 397 n.16 (1979) ("Appellees, as the prevailing parties, may of course assert any ground in support of that judgment, whether or not that ground was relied upon or even considered by the trial court"); New Castle County v. Hartford Accident and Indemnity Co., 933 F.2d 1162, 1205 (3d Cir. 1990) ("A cross-appeal is unnecessary when an appellee endeavors to affirm a judgment in its favor by proffering an alternative theory in support of the
district court's decision").

17

their allegation is based." Id. at 285 (citing James W. Moore and Jo D. Lucas, Moore's Federal Practice P 9.03[1] at 9-29 (1991) ("where the facts are in the exclusive possession of the adversary, courts should permit the pleader to allege the facts on information and belief, provided a statement of the facts upon which the belief is founded is proffered")). Specifically, we required that "[t]o avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." Shapiro, 964 F.2d at 285. We directed that "plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint." Id.

The complaint in the case before us directly addresses

these standards. Paragraph 43, for example, restates the Shapiro standard word-for-word, then goes on to list the sources of information which plaintiffs have reviewed. App. at 36. The proffered list of "publicly available information" is expansive, including filings with the SEC, annual reports, press releases, recorded interviews, media reports on the company, and reports of securities analysts and investor advisory services.10 Further, plaintiffs -- presumably cognizant that their efforts were required to be "not limited to" publicly available information -- "consulted with and obtained the advice of an expert in financial analysis in connection with the meaning and method of calculation of [Quaker's] leverage ratios and the implications of defendants' decision to change [Quaker's] leverage ratio." App. at 37. Finally, the complaint makes the requisite assertion that "the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public and lie exclusively within the possession and control of defendants." Complaint at P 44.

The complaint therefore meets the requirements of Rule 9(b). Accordingly, we hold that Rule 9(b) does not offer a viable alternative ground for dismissal.

_____

10. It is not clear whether these last reports were "publicly available."

18

B. The Earnings Growth Projections

For the reasons discussed above, we have concluded that plaintiffs' claim based on defendants' statements about the total debt-to-total capitalization guideline ratio should not have been dismissed. We do not, however, think that plaintiffs' claim based on defendants' projections of earnings growth merits resuscitation. The district court correctly held that, in the particular circumstances of this case, these projections were immaterial.11

Smithburg's statement at the August 4, 1994 "public meeting" that Quaker was "confident of achieving at least 7% real earnings growth" in fiscal 1995, Complaint at P 27, might -- if left unmodified until the announcement of the merger -- have supported an action under 10b-5. 12 Statements of "soft information" from high-ranking corporate officials can be actionable if they are made without a reasonable basis. See Shapiro, 964 F.2d at 283. And Smithburg's was not a vague expression of optimism like those that we have in the past held to be immaterial. See, e.g., In re Burlington Coat Factory Securities Litigation,

114 F.3d 1410, 1432 (3d Cir. 1997) (finding vague and therefore immaterial "a general, non-specific statement of optimism or hope that a trend will continue"); Shapiro, 964 F.2d at 283 n.12 (holding "United Jersey looks to the future

_____

11. We are not, however, persuaded by the district court's view that the earnings projections were per se reasonable because they were in accord with the company's performance over the previousfive years. 928 F. Supp. at 1386. A per se rule immunizing Quaker from the need to speak truthfully about the future merely because the company had performed well in the past seems to us improvident. It is not difficult to imagine situations in which the management of a company is well aware of circumstances, not previously present, which are very likely to have a grievous (or, for that matter, salutary) impact on future earnings; in such circumstances, a mere repetition of earnings figures for previous years might indeed give rise to liability.

12. On the other hand, the effect of the merger on earnings growth, whatever it might have been, was almost certainly less direct and immediate than the effect of the merger on the total debt-total capitalization ratio. An increase in debt level is concrete and, in these circumstances, easy to foresee. A decrease in earnings growth seems to us a less readily foreseeable outcome of an acquisition.

19

with great optimism" to be "inactionable puffing"). Instead, it was a specific figure regarding a particular, defined time period -- namely, fiscal 1995.

Furthermore, the statement contained no explicit cautionary language. The "bespeaks caution" doctrine, adopted by this court in In re Trump Casino Securities Litigation, 7 F.3d 357 (3d Cir. 1993), cert. denied, 510 U.S. 1178 (1994), provides that when "forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the `total mix' of information . .. provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." Id. at 371. Smithburg's statement was accompanied by no such language.13

However, for the statement to have had deleterious effect, it would have had to remain "alive" in the market, unmodified, until the merger was announced. See Burlington, 114 F.3d at 1432. Plaintiffs allege that the harm caused by defendants' conduct -- a reduction in the value of plaintiffs' shares -- occurred only after the November 2 announcement of the Snapple acquisition. If defendants

made a public statement tending to cure any misleading effects of Smithburg's statement between August 4, the date of the news conference, and November 2, then Smithburg's statement would essentially be neutralized, and thereby made immaterial.

Quaker's 1994 Annual Report -- issued on September 23, 1994, more than five weeks prior to the November 2 merger announcement -- contained the statement that "we

_____

13. We note, as did the district court, that at the same meeting at which Smithburg stated that Quaker was " `confident' of achieving at least 7% real earnings growth," he also acknowledged that the company had "missed its 7% target" for fiscal 1994. But we do not believe that this latter statement constituted meaningfully cautionary language. Indeed, it seems to us just as likely that the fact that Smithburg expressed "confidence" in his projected figure while openly acknowledging a missed target the previous year would inspire greater belief in his current prediction.

20

are committed to achieving a real earnings growth of at least 7 percent over time." Complaint at P 33 (emphasis added). We conclude that the phrase "over time" in this second statement inoculates Quaker from any claims of fraud that point to a decline in earnings growth in the immediate aftermath of the Snapple acquisition. No reasonably careful investor would find material a prediction of seven-percent growth followed by the qualifier "over time." Therefore, we hold that no reasonablefinder of fact could conclude that the projection influenced prudent investors.

Accordingly, we hold that the projections of earnings growth cannot form a basis for an action under S 10(b), S 20(a), and Rule 10b-5 because any misleading effect the August 4 statement might have had was cured by the qualifier "over time" that appeared in the 1994 Annual Report. Given our decision with regard to the total debt-to-total capitalization ratio guideline, this holding does not prevent plaintiffs' suit from going forward. It may, however, limit the "class period" -- should the district court, on remand, decide to certify a class -- to the period between September 23, 1994, the date of the first potentially misleading restatement of the guideline -- and November 2, 1994, the date of the merger announcement.

Therefore, we will affirm the dismissal of the earnings-growth claim, albeit for reasons different from those given by the district court.

III. Conclusion

The order of the district court dismissing plaintiffs' complaint for failure to state a claim is reversed and the case remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit